## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| B-TEC ENTERPRISES, INC., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Case No.: |
| v. | ) | |
| | ) | 2:21-CV-135-RWS |
| RESOLUTE TISSUE, LLC., | ) | |
| EDGEWOOD PAPER COMPANY, | ) | |
| INC.; STOVER'S, LLC d/b/a | ) | **JURY TRIAL DEMANDED** |
| STOVER'S LIQUIDATION | ) | |
| | ) | |
|     Defendants. | ) | |

## COMPLAINT

Plaintiff B-TEC Enterprises, Inc. files this action against Resolute Tissue, LLC, Edgewood Paper Company, Inc. and Stover's, LLC, d/b/a Stover's Liquidation ("Defendants") seeking damages and other review as the Court deems just and proper, showing the Court as follows:

## PARTIES, JURISDICTION AND VENUE

1.

Plaintiff B-TEC Enterprises, Inc. (hereinafter referred to as "BTEC" or "Plaintiff") is a corporation organized and existing under the laws of the State of Georgia with its principal place of business located at 96 Craig St., Suite 112-310, E. Ellijay, Georgia 30540, and submits to the jurisdiction and venue of this Court.

2.

Defendant RESOLUTE TISSUE, LLC ("Resolute") is a Delaware
Corporation with its principal place of business in Miami, Florida. Resolute Tissue
can be served with process upon its registered agent CT Corporation at 300
Montvue Road, Knoxville, Tennessee 37919.

3.

Defendant EDGEWOOD PAPER COMPANY, INC. ("Edgewood") is a
Pennsylvania corporation with its principal places of business in Yardley,
Pennsylvania. Edgewood can be served with legal process on its President Ronald
Check at its principal place of business at 115 Floral Vale Boulevard, Yardley,
Pennsylvania 19067 or its registered agent located at 303 One Neshaminy Interplex
Trevose, Pennsylvania 19047.

4.

Defendant STOVER'S LLC d/b/a Stover's Liquidation ("Stover's") is a
Tennessee corporation with its principal place of business in Cookeville,
Tennessee. Stover's can be served with legal process on its registered agent Tim
Stover at 452 W. Broad St., Cookeville, Tennessee 38501.

5.

Defendants transact substantial business in Georgia and throughout the

United States and have committed tortious acts and injuries in Georgia, including the geographic area comprising the jurisdiction of the Gainesville Division of the Northern District of Georgia.

6.

This Court has original jurisdiction over this action for money damages in excess of $75,000.00 involving citizens of different states. 28 U.S.C. § 1332.

7.

Venue is proper as a substantial part of the events or omissions giving rise to the claim that occurred in the geographic area comprising the jurisdiction of the Gainesville Division of the Northern District of Georgia. 28 U.S.C. § 1391(b)(2).

8.

This Court has jurisdiction over the subject matter and Defendants.

## **FACTS**

9.

In Spring of 2020, Resolute manufactured paper towels and packaged them using Wakefern's packing and PAPERBIRD brand.

10.

However, Wakefern rejected these paper towels as defective due to quality assurance issues; specifically, that the towels leaked a blue tint when wet,

especially when squeezed. Due to this defect, these products were placed in a

Quality Assurances "QA" hold.

11.

As a result of Wakefern's rejection of the product, Resolute was instructed

to "neutralize" the product by removing it from Wakefern packing, and if sold, to

ensure that the defective paper towels were not sold under the Wakefern

PAPERBIRD brand name.

12.

Despite being instructed to repackage the rolls, in an effort to avoid the cost

of repackaging, Resolute agreed to sell the defective paper towels on the

liquidation market without any proper assurances that the product was properly

neutralized or that the defect was disclosed.

13.

Specifically, Resolute entered into an agreement with a liquidation company,

Edgewood, and entered into a deal to sell the defective products in QA hold.

Specifically, the defective inventory included the following defective product:

- S/R Touch of Color SAS towels: Blue embossing; 2-Ply; 110 sheets;

  11 x 5.5

  o 1-Roll Pack – 30 Packs per case, 20 cases per pallet, 30 pallets

per TL= 600 cases per truckload

- 9,360 cases     15.6 Truckloads available

o 2-Roll Pack – 12 Packs per case, 24 cases per pallet, 30 pallets

per TL=720 cases per truckload

- 4,940 Cases     6.9 Truckloads available

14.

Although Resolute disclosed the defect to Edgewood, it did nothing to ensure that this defect was made known to anyone else, despite knowing that the paper towels were going to be resold to another outlet. In addition, despite being told that the product would be taken out of the packaging, Resolute did nothing to ensure that this was ever done nor did it make any attempt to repackage the paper towels itself.

15.

Resolute then sold the defective paper towels to Edgewood in April of 2020, who, in turn, sold them to Stover's LLC.

16.

At no time did Resolute ever take any actions to ensure that Edgewood or any subsequent sellers inform buyers of the defective condition of the paper towels. In addition, at no time did Resolute ever take action to remove the paper

towels out of the packaging before selling them or to ensure that any of its subsequent sellers met this presale condition.

17.

Edgewood then sold the defective paper towels to Stover's. Upon information and belief, at the time of transaction, Edgewood was aware or became aware of the defective condition of the paper towels but failed to inform any subsequent buyers of the defective condition of the paper towels.

18.

Despite this knowledge, Stover's sold the defective paper towels to BTEC without disclosing the defective condition of the paper towels. Specifically, BTEC purchased 17 truckloads of paper towels from Stover's at a total cost of $243,994.00 ($0.75 per single roll and $1.50 per double roll).

19.

Stover's never disclosed the defective condition of the paper towels to BTEC and never informed BTEC that the defective products were salvaged. Instead, Stover's represented to BTEC that they were "first quality products" that were in liquidation due to Paper Bird's decision to change their packaging.

20.

At the time BTEC purchased the defective paper towels from Stover's, Stover's only representations to BTEC were that the paper towels needed to be

removed from the Wakefern packaging and not sold in the Northeastern United States.

21.

Relying on these material misrepresentations, BTEC purchased the paper towels and resold them to United National Customer Supplier ("UNCS"), a corporation located in Fort Lauderdale, Florida.

22.

Based on Stover's representations, BTEC sold the paper towels to UNCS as "first quality products." UNCS subsequently sold the paper towels, which ultimately ended up on the shelves of 7-Eleven stores in the Northeast in the original Wakefern PAPERBIRD packaging. When Wakefern discovered this, Wakefern contacted 7-Eleven, UNCS, and other sellers and asserted intellectual property claims against them.

23.

At no time did Defendants ever disclose the defective condition of the paper towels, or the nature of said defect, to BTEC.

24.

As a result of Defendants' improper sale of these defective paper towels, BTEC has incurred the following damages: $85,000, neutralization of defective

paper towels at an additional $30,000 cost to BTEC, and attorney's fees.

## COUNT I
## NEGLIGENCE
### (All Defendants)

25.

At all relevant times, Resolute was in the business of manufacturing paper goods, including paper towels and the remaining Defendants were in the business of purchasing and selling these goods.

26.

Defendants owed a duty to exercise reasonable care in designing, manufacturing, selling, distributing, and/or otherwise placing into the stream of commerce products such as paper towels.

27.

Defendants breached its duty of care in the following ways:

a)  Designing and manufacturing paper towels with a defect that caused the product to leak blue ink when wet;

b)  Failing to "neutralize" the product as directed by Wakefern;

c)  Unilaterally deciding to sell the defective product despite having knowledge of the defective condition;

d)  Failing to implement adequate protocols to ensure that the defective condition of the product was communicated to downstream purchasers;

e) Placing the defective product into the stream of commerce;

f) Failing to place a disclaimer and/or warning on the defective product prior to placing the product into the steam of commerce; and,

g) Failing to ensure that the defective condition of the product was communicated to downstream purchasers.

28.

Defendants acted with reckless disregard in selling a defective product without implementing procedural safeguards related to subsequent sales of the product or protocols to ensure that the defective condition of the product was communicated to downstream purchasers.

29.

As a direct and proximate result of Defendants' negligence, Plaintiff suffered damages.

30.

Defendants are liable to Plaintiff for all damages flowing from its negligence.

**COUNT II**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

31.

By and through the facts as set forth herein, Defendants have been allowed

to reap a financial benefit at the expense of BTEC through the sale and purchase of the defective paper towels.

32.

Stover's represented to BTEC that the paper towels were "first quality products" and made no disclosures regarding the defective condition of the paper towels.

33.

Profits that Defendants have earned through the sales of the defective paper towels were wrongly procured, as BTEC would never have purchased the defective paper towels if their true condition had been accurately represented.

34.

Defendants have refused to reimburse BTEC for selling BTEC defective goods.

35.

Defendants have failed to act in good faith in the performance of their obligations under the sale contract by failing to disclose the defective condition of the paper towels to BTEC and failure to compensate is unjust.

36.

As a result of Defendants' unjust enrichment, BTEC has suffered significant financial damages in an amount to be determined at trial.

## COUNT III:
## BREACH OF CONTRACT
## (Against Stover's)

37.

BTEC and Stover's entered into an agreement whereby Stover's agreed to sell 18 truckloads of paper towels from to BTEC at for the total price of $223,560.00 ($0.75 per roll).

38.

Stover's breached the sale agreement when it failed to inform BTEC that the paper towels were defective and not to be sold under the Wakefern PAPERBIRD brand name.

39.

When Stover's sold the defective paper towels to BTEC, the only representation that Stover's made to BTEC about the paper towels was that they were removed from the Wakefern packaging and not sold in the Northeastern United States.

40.

Stover's represented to BTEC that the paper towels were "first quality products" that were free of defects.

41.

As a result of Defendants' breach of contract, BTEC Plaintiffs have incurred

substantial financial injury in an amount to be proven at trial.

## COUNT IV
## FRAUD
### (Against Edgewood and Stover's)

42.

Despite having knowledge of the defective condition of the paper towels, upon information and belief, Defendants represented both orally and/or in writing that the paper towels were "first quality products" that were free of defects.

43.

At no time did Defendant Edgewood or Stover's ever disclose to BTEC that the paper towels were defective or that they leaked a blue tint when wet.

44.

Edgewood never disclosed the defective condition of the paper towels to Stover's. Instead, when Stover's purchased the defective paper towels from Edgewood, the only representations made to Stover's were that the paper towels had to be removed from the Wakefern packaging and not sold in the Northeastern United States.

45.

Edgewood knew or had reason to know that Stover's would pass on these representations to BTEC.

46.

Stover's never disclosed the defective condition of the product to BTEC.

47.

At the time these representations were made, Defendants knew these material representations were false and they were made with the specific intention of deceiving BTEC as a buyer, or without exercising reasonable care as to their truthfulness. Specifically, they were made with the intention of inducing BTEC to buy these defective paper towels at a price that BTEC would not otherwise have paid if it had known that the product was defective.

48.

Relying on these material representations, BTEC purchased the paper towels and Defendants led BTEC to believe that the product was legitimate.

49.

Based on those representations, BTEC subsequently sold the paper towels to UNCS as "first quality products," as was represented to them. UNCS subsequently sold the paper towels, which ultimately ended up at 7-Eleven stores in the Northeast in the original Wakefern PAPERBIRD packaging.

50.

BTEC foreseeably relied on Defendants' representations to its own

detriment.

51.

As a direct and proximate result of Defendants' unlawful and fraudulent

acts, BTEC has been harmed and damaged in an amount of more than $140,000 in

losses incurred involving this transaction and other damages to be proven at trial.

## COUNT V
## FRAUDULENT MISREPRESENTATION
### (Against Edgewood and Stover's)

52.

Despite having knowledge of the defective condition of the paper towels,

upon information and belief, Defendants fraudulently misrepresented both orally

and/or in writing that the paper towels were "first quality products" that were free

of defects knowing this was false.

53.

At no time did Defendant Edgewood or Stover's ever disclose to BTEC that

the paper towels were defective or that they leaked a blue tint when wet.

54.

Edgewood never disclosed to Stover's the defective product defect. Instead,

when Stover's purchased the defective paper towels from Edgewood the only

representations made to Stover's about the paper towels was that they had to be removed from the Wakefern packaging and not sold in the Northeast U.S.

55.

Edgewood knew or had reason to know that Stover's would pass on those representations to Plaintiff.

56.

Stover's never disclosed to BTEC the defective product defect to BTEC. Instead, when BTEC purchased the defective paper towels from Stover's the only representations made to BTEC about the paper towels was that they had to be removed from the Wakefern packaging and not sold in the Northeast U.S.

57.

At the time these representations were made, Defendants made these misrepresentations with the intent of inducing Plaintiff to rely on these misrepresentations so that it would buy these products and with the specific intention of inducing Plaintiff to buy these defective paper towels and at a price that BTEC would not otherwise have paid if it had known that the product was defective.

58.

Relying on these material representations, BTEC purchased the paper towels and Defendants led Plaintiff to believe that the product was legitimate and

justifiably relied on these fraudulent misrepresentations.

59.

Based on those misrepresentations, BTEC then sold the paper towels to UNCS as "first quality products" as was represented to them. UNCS sold the paper towels which ultimately ended up at 7-Eleven stores in the Northeast in the original Wakefern PAPERBIRD packaging. When Wakefern discovered this, it contacted 7-Eleven, and other sellers including UNCS asserting intellectual property claims against them.

60.

Plaintiff foreseeably relied on these representations to its detriment.

61.

As a direct and proximate result of Defendant's unlawful and fraudulent acts, Plaintiff has been harmed and damaged in the amount of over $140,000 in losses incurred involving this transaction and other damages to be proven at trial.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**
**(Against All Defendants)**

62.

Despite having knowledge of the defective condition of the paper towels, upon information and belief, Defendants negligently misrepresented both orally

and/or in writing that the paper towels were "first quality products" that were free of defects which constituted a false representation of omission of a material fact.

63.

At no time did Defendants ever disclose to BTEC that the paper towels were defective or that they leaked a blue tint when wet, despite having knowledge of this.

64.

At no time did Resolute ever take any actions to ensure that Edgewood or any subsequent sellers inform buyers of the defective condition of the paper towels. In addition, at no time did Resolute ever take action to remove the paper towels out of the packaging before selling them or to ensure that any of its subsequent sellers met this presale condition.

65.

Subsequently, Edgewood never disclosed to Stover's the defective product defect. Instead, when Stover's purchased the defective paper towels from Edgewood the only representations made to Stover's about the paper towels was that they had to be removed from the Wakefern packaging and not sold in the Northeast U.S.

66.

Edgewood knew or had reason to know that Stover's would pass on those

representations to Plaintiff.

67.

Finally, Stover's never disclosed to BTEC the defective product defect to BTEC. Instead, when BTEC purchased the defective paper towels from Stover's the only representations made to BTEC about the paper towels was that they had to be removed from the Wakefern packaging and not sold in the Northeast U.S.

68.

At the time these representations were made, Defendants made these false misrepresentations with the specific intention of inducing Plaintiff to buy these defective paper towels and at a price that BTEC would not otherwise have paid if it had known that the product was defective.

69.

At all times relevant, Defendants owed a duty of reasonable care to Plaintiff.

70.

Relying on these material representations, BTEC purchased the paper towels and Defendants led Plaintiff to believe that the product was legitimate and justifiably relied on these negligent misrepresentations.

71.

Based on those misrepresentations, BTEC then sold the paper towels to UNCS as "first quality products" as was represented to them. UNCS sold the paper

towels which ultimately ended up at 7-Eleven stores in the Northeast in the original Wakefern PAPERBIRD packaging. When Wakefern discovered this, it contacted 7-Eleven, and other sellers including UNCS asserting intellectual property claims against them.

72.

Plaintiff foreseeably relied on these representations to its detriment.

73.

As a direct and proximate result of Defendant's unlawful and fraudulent acts, Plaintiff has been harmed and damaged in the amount of over $140,000 in losses incurred involving this transaction and other damages to be proven at trial.

**COUNT VII**
**ATTORNEY'S FEES**
**(All Defendants)**

74.

Defendants' actions constitute willful, intentional, and tortious conduct. Every intentional tort involves an element of bad faith that entitles a person to recover the expenses of litigation, including attorney's fees.

75.

Defendants have acted, or failed to act, in bad faith, have been stubbornly litigious, and/or have caused Plaintiffs unnecessary trouble and expense.

76.

Plaintiffs are entitled to recover the necessary expenses of litigation, including their attorneys' fees from the Defendants pursuant to O.C.G.A. § 13-6-11.

## COUNT VIII
## PUNITIVE DAMAGES
### (All Defendants)

77.

Defendants' knowing and intentional conduct warrants punitive damages in an amount to be determined by the enlightened conscience of a jury.

78.

Defendants' actions demonstrate willful misconduct, malice, wantonness, and an entire want of care that raises the presumption of conscious indifference to the consequences of such actions.

79.

Punitive damages should be imposed against Defendants in an amount sufficient to deter Defendants from engaging in similar unlawful conduct in the future.

**WHEREFORE**, Plaintiff BTEC prays that this Court:

(A)   Enter judgment in his favor against Defendants, and each of them, on Plaintiff's complaint;

(B)   Award damages against Defendants;

(C)   Award Plaintiff his reasonable attorneys' fees and expenses of
      litigation;

(D)   Award punitive damages to Plaintiff against Defendants, in an
      amount to be determined by the enlightened conscience of a fair
      and impartial jury so that Defendants may be punished for their
      actions and deterred from continuing to violate known rights;

(E)   Order such other and further relief as this Court deems to be
      just and proper; and

(F)   **TRIAL BY JURY**.

WHEREFORE, Plaintiffs pray and respectfully demand verdict and
judgement as follows:


Respectfully submitted this 23rd day of June, 2021.

                        **PENN LAW LLC**

                        */s/ Darren W. Penn*
                        DARREN W. PENN
                        Georgia Bar No. 571322
                        darren@pennlawgroup.com
                        ALEXANDRA "SACHI" COLE
                        Georgia Bar No. 696892
                        sachi@pennlawgroup.com
                        KEVIN M. KETNER
                        Georgia Bar No. 418233

4200 Northside Parkway, NW
Building One, Suite 100
Atlanta, Georgia 30327
Phone/Fax: (404) 961-7655